[Crim. No. 3944. Second Dist., Div. Three. May 27, 1946.]

THE PEOPLE, Respondent, v. ALBERT E. CALE et al.,
Appellants.

Martin S. Ryan and Avery M. Blount for Appellants.

Robert W. Kenny, Attorney General, Frank Richards, Deputy Attorney General, Fred N. Howser, District Attorney, and Jere J. Sullivan and Robert Wheeler, Deputies District Attorney, for Respondent.

DESMOND, P. J.—Defendants Cale and Houghton were convicted jointly in a jury-waived trial of the crime of receiving stolen property. It was agreed when the case was

called for trial that the court might consider the People's case as presented in the transcript of evidence taken at their preliminary hearing. A few days later the case was reopened for presentation of the defendants' case and for decision, at which hearing both defendants testified and the People offered rebuttal testimony. From the judgment of conviction the defendants have appealed.

They contend that the testimony upon which they were convicted was furnished by an accomplice and that there was no sufficient corroboration of that testimony to warrant their conviction.

Both Cale and Houghton were engaged in the upholstery business, the former being employed by the Bimini Upholstery Shop where Houghton at one time was also employed. In Houghton's opening brief the following appears: "Defendant's position in this appeal is that he admits that a crime has been committed and that the merchandise which he was accused of having received, and which he freely and fully admitted having in his possession at the time of his arrest, was indeed stolen merchandise, but that he purchased the same in good faith and without knowledge or suspicion that it was stolen." Defendant Cale states in his opening brief: "It appeared from the evidence that certain bolts of woolen materials, as well as other bolts of similar materials, had been stolen in the City of Los Angeles, State of California, and that some of the bolts of material that were stolen were in the possession of one Harris who had them in a garage at the rear of the premises located at. 1135 E. 49th Street, Los Angeles." It is apparent from these two excerpts that one appellant admits that the goods were stolen and the other states that the evidence disclosed that fact.

The facts relating to the theft of the merchandise in question need not be gone into at length but it is pertinent to state that the merchandise recovered at appellant Houghton's home and at the Bimini Upholstery Shop, where defendant Cale was employed, and at the garage on East 49th Street was all positively identified as having been shipped and invoiced from New York City to a firm in Los Angeles and received there and loaded onto a truck at Western Carloading Company and that thereafter the truck containing the merchandise was stolen while the driver was away from it and that the truck was later recovered without the merchandise in it.

Ralph Thomas Kronheimer appeared as the principal witness for the People. According to his testimony he had known Houghton for fifteen years and Cale for about three years; that on January 3, 1945, he met Houghton in a traffic court in Los Angeles and from there rode out on a streetcar toward Kronheimer's house; that Houghton had stated that he had just closed his business and "was in line for getting some upholstery goods"; that he had a backer and if Kronheimer could get the goods for him "he would be glad to pay for it." He stated that about a week later he told Houghton that he had not found any materials yet but had contacted another man on it; that Houghton stated "that he did not care how 'hot' they were as long as he got the materials he wanted," and Kronheimer then told him that he "would tell the guy what he said," referring to one Carl Harris, who with a man named Weston, was charged with the actual theft of the merchandise which these defendants were accused of receiving as stolen property. Another week later, on January 17th, Houghton, according to Kronheimer, stated that he needed materials very badly and simply must have some very soon; that he did not care how much they cost since he had plenty of backing and money to pay for them; that he then told Houghton that he "would go back and see the man again"; that on January 25th he talked with Carl Harris at a beer joint at Jefferson and Main Streets and on the following morning he telephoned Houghton saying that the man had upholstery materials. Kronheimer further testified that he told both Cale and Houghton that the materials were "plenty hot"; that "I told them I didn't know just exactly how hot it was, but they said they would buy any amount as long as they could get all they wanted." At an appointed time next day, January 26th, he and both defendants started in Houghton's car and went to the garage where the materials were stored. On the way they stopped and picked up Harris, the colored man whom Kronheimer had contacted, and all four of the men then proceeded by a devious route to the garage on East 49th Street where they drove onto a lot past two houses to the rear of a dilapidated shed about 8 feet wide and about 10 feet long. This garage was loaded with materials stacked therein, and consisting of boxes and bolts of material. They were unable to enter the garage by any doorway so, according to Kronheimer,

Harris stripped a board from the side of the garage leaving a space through which they all entered. This witness testified that a few bundles were inspected by tearing off a portion of the paper wrappings and Cale said that the stuff was second grade materials and Houghton said that it was of no value to him. However, they agreed that they could use certain materials and Cale went out, turned Houghton's car around, and backed it into the side of the garage. Kronheimer testified that Cale passed thirteen bolts of goods to him which he stored in Houghton's car. Harris remained in the garage while the other men drove away. On Commonwealth Avenue between Third and Sixth Streets, Cale got his own automobile and six or seven of the bundles were placed therein. Kronheimer stated that he told Houghton that he needed money at that time and they drove to the neighborhood of a bank at Sixth and Alexandria Streets; that Cale and Houghton went into the bank while he remained in the car; that shortly thereafter the two defendants emerged from the bank, crossed the street and Cale handed him $100 in money; that Cale also produced two receipts, one of them written upon the blank side of an application for money order, cashier's check or draft, and the other upon the blank side of a deposit slip of the Bank of America. These were admitted in evidence as Exhibits 14 and 15 and read as follows: "Jan 26, 1945 Received of B. D. Houghton $~~550.00~~ $\overset{150.00}{}$ for Items delivered in Material. *John Hammerstein*." "Rec of Bert Cale $100.00 One hundred items delivered. *John Hammerstein*." As to Exhibit 14 and the numerals thereon, Kronheimer testified that when he signed it $50 appeared there and that the figure had been raised or attempted to be raised after it left his hands. As to the signature "John Hammerstein" upon these exhibits, Kronheimer stated that Cale suggested the name of John Hammerstein. "He said he didn't want me to sign my own name but he said he did not care what name I signed on these slips. . . . He said he was going to use them as a matter of record in his business." The witness testified that he received a total of $100 in cash at that time, although he had asked Houghton for $150. He further testified that on the following day he received $50 from Houghton. ". . . [H]e said he felt that he had gyped me, so he brought this $50.00 over to me at that time."

Houghton, on the other hand, testified that when he en-

tered the bank he had $50 and had to cash a check for $50 more; that Cale at the same time cashed a check on his firm for $100; that while they were in the bank they each made up a bill of sale, a term which he applied to the receipts above mentioned; that they then crossed the street and each of them handed Kronheimer $100 cash. He contradicted Kronheimer's testimony that he had paid the latter $50 at 10 a. m., January 27th, saying that it was impossible for him to do so for the reason that he was placed under arrest about 9:30 that morning and was then in the custody of officers Wise and McBride.

These officers had gone to the Bimini Upholstery Shop on the morning of January 27th. They found there three of the stolen rolls of goods. They then proceeded to Houghton's flat where they arrested him and seized altogether thirteen bolts of the goods, two in a small closet off the front room and eleven in Houghton's Dodge car, which was parked in his garage. When Houghton was asked from whom he bought the materials he stated that he did not know the fellow, "He gave me a receipt with his name on it. I don't know him." He then showed the officers the receipt which was introduced as Exhibit 14, upon which his own name appears. The officer testified that he asked him if he was in the habit of buying materials "like that" where "they don't have a bill or anything?" To this Houghton replied, "Well, I will tell you. A fellow called me up and said he had some material for me and wanted to know if I could use it? And I said, 'Yes' "; that he then stated that he met a fellow on Jefferson and Main. Officer Wise then called Houghton's attention to the fact that he had stated that he had gone to meet a man on a street corner who took him down to the colored part of town where there were no upholstery shops, that he had said he bought the material from a fellow who did not have a bill of sale to give, that he had said he bought the goods piled up in a garage. Under these circumstances, Wise propounded the question to Houghton, "Do you think you are buying it legitimate?" To this Houghton replied, "Us fellows in the upholstery business, we buy the material just wherever we can, whether it is in one roll or ten rolls, and we never question them how they get it or whether it is 'hot', and 'As long as I can get a receipt, I thought I was in the clear,' and 'I saw that for the price I could buy it for, it was a chance for me

to make a fortune.' " The officers then took Houghton over to the Bimini Upholstery Shop where a Mr. Matson, standing at the front door, inquired of Houghton, "What is the trouble, Buddy?", to which Houghton replied, "I guess that stuff I bought yesterday is hotter than I thought it."

Cale was arrested at the Bimini Upholstery Shop shortly before noon on January 27th as he entered the shop where Officer Wise was waiting for him, McBride having left taking Houghton with him. Wise told Cale that they wanted to know about the rolls of material, and the following ensued, according to the People: "Cale said, 'Well, here it is,' referring to three bolts of material the officers had found when they first went there before going to Houghton's the same morning. Wise said, 'That is not all of it?' 'Yes,' Cale said, 'that is all of it.' Wise said, 'No, now listen. That is not all of it. You bought five rolls and there are only three here.' 'Well,' Cale said, 'they should be here. I thought that was all I bought.' 'No,' Wise said, 'we are going to hunt this place over until we find it.' Cale said, 'Well, we will look around here and see if we can find them.' They went into the back room over to where there was an old davenport. Cale pulled back a curtain and said, 'This looks like it.' Wise said, 'Yes, this looks like the same kind of stuff.' Then Wise said, 'There is one more. Let's have it.' Cale looked around and said, 'Maybe it is over here,' and Cale went over in the northwest corner of the room and found another roll of white material there. That was the fifth roll of material." Cale, according to the officer, told him that he could not go to the wholesale houses or stores and buy materials; that they just laughed at him when he wanted to do so; that he had to go to the main building of Sears and Roebuck, pay retail prices, and buy material to use in the upholstery business; that "It might be hot. I expect it is from what you say." When the officer stated, "You tell me you have been an upholstery man and a buyer and know fabrics, and you tell me you can sit here in this car and tell me you can buy stuff like that for that money? . . . It don't sound right, fellow." Cale replied, according to officer Wise, "Well, . . . I guess I better stop trying to beat the O. P. A., and go out and buy in a legitimate market."

Both Houghton and Cale told the officers that Kronheimer had never stated to them that the material which they purchased was "hot" or stolen and made the same statement

when they appeared as witnesses in their own behalf. In their testimony they contradicted the statements of Kronheimer generally and, in particular, his version of signing the name "John Hammerstein" to the receipts which they had prepared. Incidentally, Cale's story of the transaction in and near the bank contradicted Houghton's recital concerning that incident. He stated that he loaned Houghton $100 while they were in the bank and that he took the five rolls of material which were found at the Bimini Upholstery Shop as security for that loan. █ Considering the various conflicting statements made by Kronheimer, Houghton and Cale, it is apparent that some lying was done, but there can be no doubt in the mind of anyone who carefully reads the transcript and notes the conditions and circumstances under which the goods were acquired by Houghton and Cale that they were guilty of receiving stolen property. It is true that evidence to that effect was offered by Kronheimer but if he was an accomplice in this case (and we do not decide that point), that does not mean necessarily that his testimony is to be ignored. All the code requires in such a situation is satisfactory corroboration "by such other evidence as shall tend to connect the defendant with the commission of the offense" (Pen. Code, § 1111). This subject was treated at some length in *People* v. *Negra* (1929), 208 Cal. 64, where it is stated (p. 69) [280 P. 354] : "While the jury may consider the circumstances that a witness is an accomplice, in passing upon his credibility as a witness (*People* v. *Clough,* 73 Cal. 348, 354 [15 P. 5]), his testimony is not to be rejected merely because he is an accomplice, and if there is other evidence which measures up to the requirement of the code (*supra*), tending to connect the defendant with the commission of the crime charged, then such testimony of the accomplice is to be considered by the jury, as is any other testimony, and must be given the weight to which the jurors may conclude that it is entitled. . . . Even though circumstantial and slight, the evidence is, nevertheless, sufficient if it tends to connect the accused with the commission of the offense. (*People* v. *Martin,* 19 Cal.App. 295 [125 P. 919].) The defendant's own statements and admission, made in connection with other testimony, may afford corroboratory proof sufficient to sustain a verdict. [Citing cases.]" It is our opinion that in the present case the admissions of both defendants as to the trip into the area where they obtained the goods, and the manner and condi-

tions under which they were taken, together with the testimony concerning the signing and delivery of the handmade receipts, euphemistically termed "bills of sale," furnished all the corroboration necessary to sustain the judgment. (See *People* v. *Owens* (1946), 28 Cal.2d 191, 193 [168 P.2d 945].) In addition, of course, there was before the court the testimony of officer Wise concerning the recovery of the stolen goods and the statements of both defendants relative to the transaction.

■ The argument is made in behalf of each appellant that to justify a conviction it was necessary to establish the fact that the property had been received from Harris with guilty knowledge that it had been stolen. On this point we refer to what has already been said and we rest upon the quotation from Wharton's Criminal Law, presented in *People* v. *Clausen* (1898), 120 Cal. 381, at p. 382 [52 P. 658]: " 'Whether the defendant knew that the goods were stolen is to be determined by all the facts of the case. It is not necessary that he should have heard the facts from eyewitnesses. He is required to use the circumspection usual with persons taking goods by private purchase; and this is eminently the case with dealers buying at greatly depreciated rates. That which a man in the defendant's position ought to have suspected he must be regarded as having suspected, as far as was necessary to put him on guard and on his inquiries. . . . The proof in any case is to be inferential, and among the inferences prominent are inadequacy of price, irresponsibility of vendor or depositor.' "

■ After the trial judge adjudged the defendants guilty he permitted both of them to file an application for probation, stating, however, "as far as Mr. Houghton is concerned, he is not legally eligible for probation." This was because of a prior conviction of a felony charged against Houghton in the complaint filed in this case and admitted by him. The court made a further statement as follows: "I am always glad to have all the information which is available, about any individual before pronouncing sentence. I might say that, as it has come up here before, I know of Mr. Houghton, or I knew him personally for a number of years through members of his family, and if I had looked at this case before it came in here I don't know if I would have cared to handle it, but it is here in a proper fashion and I have heard it, without any regard to any personalities at all; but, Mr. Houghton, as I

said to Mr. Cale, there is no question but that you are up against a pretty stiff proposition here.'' Upon this statement defendant Houghton predicates a claim that the judge "indicated that he had some personal feeling toward defendant, and defendant was therefore prevented from having the fair and impartial trial to which he was entitled under the law.'' Inasmuch as the judge declared that he heard the case "without any regard to any personalities at all,'' we conclude that he considered the evidence with a fair and open mind and that defendant Houghton suffered no disadvantage whatever. It is said in *Goodspeed* v. *Great Western P. Co.* (1937), 19 Cal. App.2d 435, at page 450 [65 P.2d 1342], a case where affidavits were filed charging that the trial judge entertained bias or prejudice against certain defendants that "No knowledge, experience or opinion can give rise to bias or prejudice unless it results in hostility or ill will. . . .'' It clearly appears that there was no hostility or ill will toward Houghton on the part of the trial judge.

The judgments are affirmed.

Shinn, J., and Wood, J., concurred.